**Honiss W. CANE, Jr., et al.,**

v.

**WORCESTER COUNTY, MARYLAND, et al.**

**Civ. No. Y–92–3226.**

United States District Court, D. Maryland.

Jan. 7, 1994.

C. Christopher Brown, Baltimore, MD and Deborah A. Jeon, Cambridge, MD, for plaintiffs.

James Richard Dennis Collins, Ocean City, MD; Edward H. Hammond, Jr., Ocean City, MD and Benjamin E. Griffith, Cleveland, MS, for defendants.

## OPINION

JOSEPH H. YOUNG, Senior District Judge.

Honiss W. Cane, Jr., Fannie Birckhead, James L. Purnell, Sr. and Saunders Marshall ("plaintiffs") have sued Worcester County, Maryland, George M. Hurley, John E. Bloxom, Reginald T. Hancock, Floyd F. Basett and Jeanne Lynch ("defendants"), and the Worcester County Board of Commissioners ("Board"), alleging that the system for electing members to the Board violates § 2 of the Voting Rights Act by discriminating against African–American voters.

*Worcester County Government*

Worcester County is a predominantly rural county located in the southeastern part of Maryland. It borders the states of Delaware and Virginia as well as the Atlantic Ocean. The County contains four incorporated towns: Berlin, Ocean City, Pocomoke and Snow Hill. According to the 1990 Census, Worcester County has an African–American population of 7,448 persons or 21.26% of the total population of 35,028 persons. The African–American voting age population of the County is 5,237 persons or 19.16% of the total voting age population of 27,331 persons. The African–American population is concentrated in four areas of the county: Pocomoke, Stockton, Snow Hill and Berlin.

The Board serves as the legislative and governing body of the County. Its members

are elected at-large [1] under a residency district system. The entire electorate of Worcester County votes on candidates for each of the five seats. Four of the seats correspond to the County's residency districts. Candidates are required to reside in the appropriate district. The fifth member, the commissioner-at-large, must be a resident of the County, but is not subject to a district residency requirement. The five candidates who receive the most votes in the general election are elected to the Board.

The plaintiffs allege that the system for electing the Board violates § 2 of the Voting Rights Act, 42 U.S.C. § 1973 (1982). Based on the theory of "vote dilution," the plaintiffs' claim alleges that under the current election system, the votes of African–American citizens are diluted when compared to the votes of the white majority.

## DISCUSSION

Section 2 of the Voting Rights Act provides:

(a) No voting ... practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color ...

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes ... are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representative of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (Supp.1991). [2]

The § 2 amendments make clear that a violation of the section can be proved by showing discriminatory effect alone, rather than having to show a discriminatory purpose, and establish that the relevant legal standard is the "results test." Under the results test, courts can invalidate "at-large" electoral systems if plaintiffs prove that the system operates to "dilute" the vote of minority voters, or limits their opportunity to participate in the political processes and to elect legislators of their choice. *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). This test challenges

---

1. In an at-large election, the entire jurisdiction forms a single electoral district from which all the officials are chosen.

2. The Senate Judiciary Committee Report accompanying the bill which amended § 2 sets out factors which might be probative of a violation. The seven "typical factors" and two "additional factors" are:

   1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

   2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

   3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provision, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

   4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

   5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

   6. whether political campaigns have been characterized by overt or subtle racial appeals;

   7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

   8. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;

   9. whether policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

   S.Rep. No. 97–417, 97th Cong.2d Sess. 28 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 206–07.

those at-large systems which work to systematically exclude minority-preferred candidates, on the theory that in an at-large system, "where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters." *Thornburg v. Gingles,* 478 U.S. 30, 49, 106 S.Ct. 2752, 2766, 92 L.Ed.2d 25 (1986).

■ In setting forth the elements for a successful § 2 challenge, the plaintiffs must prove three preconditions: 1) the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; 2) the minority group is politically cohesive; and 3) the majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority's preferred candidate. *Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766–67. Although these three factors are preconditions to a § 2 claim, "the essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by African–Americans and white voters to elect their preferred representative." *Id.* at 47, 106 S.Ct. at 2764.

A. *Sufficiently Large and Geographically Compact*

■ The first factor requires the minority group to prove that it is sufficiently large and geographically compact to create a majority, if it were voting in a single-member district. *Gingles,* 478 U.S. at 50, 106 S.Ct. at 2766. Plaintiffs have presented two alternative district configurations,[3] each having a majority African–American voting age population within a five-district plan.[4] The African–American population is spread throughout

several regions of the County, but it is concentrated in several small pockets which can be connected to create a district with a majority African–American voting age population of 58% to 62%. *See McGhee v. Granville County,* 860 F.2d 110, 115 (4th Cir.1988) (county's proposed remedial single member district plan contained seven districts, the two minority districts had 67.5% and 51.8% minority voting age populations and thus met the relevant standard); *Solomon v. Liberty County,* 899 F.2d 1012, 1018 (11th Cir.1990), *cert. denied,* 498 U.S. 1023, 111 S.Ct. 670, 112 L.Ed.2d 663 (1991) (the evidence showed the African–Americans would constitute a majority of a district's voting age population); *Westwego Citizens for a Better Government v. Westwego,* 946 F.2d 1109, 1117 (5th Cir. 1991) (proposed plan showed the district would have an African–American majority of 59.1% of the total population and an African–American voting majority of 52.8%).

■ The defendants claim that it is not possible to draw a district which contains an African–American voting majority that is reasonably compact and argue that such a district would be too winding and irregular in shape to be acceptable under the governing standards. However, compactness is a relative concept which must be interpreted in light of § 2's "laudatory national mission" of opening the political process to minorities. *See Dillard v. Baldwin County Bd. of Educ.,* 686 F.Supp. 1459, 1465–66 (M.D.Ala.1988); *Neal v. Coleburn,* 689 F.Supp. 1426, 1435 (E.D.Va.1988).

The plaintiffs' proposed Plan 1 is not unreasonably irregular in shape, considering the population dispersal within the County. The plan merely affirms the existing racial divisions in the County. While the plan does entail running the newly created districts

---

3. Plaintiffs also proposed a third district configuration with one majority African–American district within a seven-district plan. However, the Fourth Circuit has ruled that district courts should not change the number of members on a governing board if it is not necessary to create an African–American majority district. *Hines v. Ahoskie,* 998 F.2d 1266 (4th Cir.1993). Therefore, the third configuration will not be considered.

4. The plaintiffs' proposed plans have one district with a majority African–American total population and a majority African–American voting age population:

|        | Total Black Population | Black Voting Age Population |
|--------|------------------------|----------------------------|
| Plan 1 | 65.1%                  | 62.1%                      |
| Plan 2 | 60.0%                  | 57.8%                      |

across other voting district lines and through towns, this is unavoidable because of the heavy white population and the need to achieve a majority African–American population in one of the districts. The districts may not be symmetrical, but they are compact. They do not rely on districts that run through several "tentacle-like corridors" nor are the district's boundary lines so unreasonably irregular, bizarre or uncouth as to approach obvious gerrymandering. They are in line with the configurations of electoral districts that have been approved in other cases.

## B. *Racially Polarized*

■ Racially polarized voting represents "a consistent relationship between [the] race of the voter and the way in which the voter votes," *Gingles,* 478 U.S. at 46, n. 11, 106 S.Ct. at 2764 n. 11, and is politically or substantively significant if a cohesive minority electorate is typically unable to elect its preferred candidate in the face of majority opposition. *Id.* at 55, 106 S.Ct. at 2768. However, there is no simple doctrinal test for determining whether a certain level of racially polarized voting is legally significant. *Id.* at 57, 106 S.Ct. at 2769. "Discrete inquiries into minority and white voting practices" is necessary to determine whether a given district experiences legally significant racially polarized voting. *Id.* at 56, 106 S.Ct. at 2769.

### 1. *Politically Cohesive*

■ Plaintiffs must show that African–Americans are sufficiently cohesive in their voting behavior to be treated as a group with common political interests. To prove this, plaintiffs must show that "a significant number of minority group members *usually* vote for the same candidates." *Gingles,* 478 U.S. at 56, 106 S.Ct. at 2769 (emphasis added).

■ At trial, the plaintiffs relied upon the testimony of Theodore S. Arrington, Ph.D., Professor of the Department of Political Science at the University of North Carolina. The Court qualified Dr. Arrington as an expert to testify on voting behavior, political analysis, party politics and racial voting patterns. To counter Dr. Arrington's testimony, the defendants presented testimony from Ronald E. Weber, Ph.D., Professor of Government and Political Science at the University of Wisconsin. Dr. Weber was qualified as an expert to testify on political science, statistics, vote dilution, demography and political systems.

The experts used two methods for analyzing voting behavior in Worcester County: ecological regression analysis and homogeneous case analysis, both methods having been approved in *Gingles,* 478 U.S. at 52–53, 106 S.Ct. at 2767–68. Ecological regression analysis seeks to express the relationship between two variables: the votes for a given candidate and the percentage of African–Americans or whites in a precinct. Data points from each precinct are plotted on a graph known as a "scatterplot." The graph illustrates how the vote for a preferred candidate changes as the percentage of African–Americans or whites in the precinct rises. Both experts agreed that the estimates of voting cohesion among African–Americans are questionable because the nine, majority-white precincts must be used to project the voting behavior of African–Americans in Worcester County and because the scatterplot of those white precincts is truncated.

Homogeneous case analysis is used to validate the results of the ecological regression analysis. In homogeneous analysis, the actual vote is studied in precincts that are at least 90% or more of one race. Because there are no African–American majority precincts in Worcester County, neither expert could validate the results of the ecological regression analysis in determining minority cohesion.

The first election in Worcester County in which an African–American was a candidate for County Commission was in 1982. The statistical evidence shows that the African–American candidate received 49% of the African–American vote. Both experts agreed that such a showing by the African–American Community for a first time minority candidate for County Commissioner was impressive, but disagreed on whether the showing

was sufficient to demonstrate cohesion.[5]

The next County Commissioner election that included an African–American candidate was in 1986. The minority candidate, a Republican, received 62% of the African–American vote. Dr. Arrington testified that African–Americans generally vote for Democrats and this election showed cohesion because the minority community had to cross party lines to vote for its preferred candidate.

Finally, in the 1990 Democratic Primary for County Commissioner, District 1, the minority candidate received 40% of the African–American vote. The lay testimony at trial indicated this candidate did not attempt to win the election, making an analysis meaningless.

■ The derivative statistical evidence for projecting minority cohesion in Worcester County is not reliable because of the lack of available data and the truncated scatterplot. In situations where the election data and derivative statistical information is unavailable because the minority group has just recently begun to sponsor candidates or where the data is unreliable, the plaintiffs may rely on factors beyond endogenous[6] election data that prove political cohesion. *See Gingles,* 478 U.S. at 57, n. 25, 106 S.Ct. at 2770, n. 25; *Hall v. Holder,* 955 F.2d 1563, 1571 (11th Cir.1992).

The most probative exogenous elections are those that include African–American Democratic candidates against white Democratic candidates.[7] The minority preferred candidate in the 1984 Democratic Primary for President, Jesse Jackson, received 79% of the minority vote, and in the 1988 election, 55% of the minority vote. The Jackson elections are probative of cohesion and show that the African–American Community strongly agreed upon whom the Democratic party should nominate. The 1986 State Democratic Primary for Lieutenant Governor and Governor is also probative of cohesion. The ticket that included a minority candidate received 67% of the African–American vote.

Further, there is a precedent in Worcester County that when a town government changes its electoral mechanism from an at-large to a single member district election system, African–Americans will elect an African–American candidate. In Pocomoke, with a 34% African–American population as of 1980, no African–American was elected at-large to the town council. After the creation of a single-member district, one of which has an African–American majority, a minority candidate was elected. Similar election patterns occurred in Snow Hill and Berlin.[8]

There was testimony that when a government changes from an at-large to a single member system, the discouragement in the African–American community which decreases cohesion is mitigated and the financial and other campaign resources flow more to the minority candidates than the white candidates. The voting patterns from the towns in Worcester County show that the elimina-

---

5. The experts also disagreed on the percentages necessary to demonstrate minority cohesion. A 60% vote is generally regarded as evidence of a landslide victory in American political history and is the more appropriate benchmark.

6. Endogenous elections include voting patterns in elections for offices the plaintiffs challenge in their § 2 suit.

7. The expert testimony established that elections involving African–American Republican candidates are problematic because African–Americans generally vote for Democratic candidates.
   This Court also finds that the 1982 and 1986 Democratic Primaries for the Democratic Central Committee are not probative of cohesion because the lay testimony established that the African–American candidate ran for office frequently and voters did not consider him a serious candidate.

8. In Snow Hill only one African–American was elected to the Town Commission until a three-district system was implemented in 1985. In the following election, an African–American candidate was elected from the African–American majority district.

   No African–American candidate had been elected to the five-member Berlin Town Council until 1980. After the town changed to a four single-member district and one at-large system with two of the districts consisting of African–American majorities, two African–Americans have been elected. The occasional success of an African–American candidates in a particular election does not necessarily disprove the existence of racial polarization. *Collins v. City of Norfolk, Va.,* 816 F.2d 932, 937–38 (4th Cir. 1987).

tion of an at-large electoral mechanism makes it more likely that the African–American community will vote cohesively in Worcester County.

Additionally, the County's African–American community is also politically active. It supports the local chapter of the NAACP which takes positions on issues of interest to the African–American community. *See Neal,* 689 F.Supp. at 1436. Indeed, the President of the NAACP testified that when Berlin was considering a redistricting proposal, the African–American community "worked together like a family." *See Sanchez v. Bond,* 875 F.2d 1488, 1493 (10th Cir.1989), *cert. denied,* 498 U.S. 937, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990) (a trial court may consider lay testimony in deciding the second *Gingles* factor); *Westwego,* 946 F.2d at 1118, n. 12 (plaintiffs may prove cohesion even without statistical evidence of racial polarization). Thus, the credible evidence establishes that African–Americans are politically cohesive in Worcester County.

### 2. White Bloc Voting

■ "The purpose of inquiring into the existence of racially polarized voting is ... to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidate." *Gingles,* 478 U.S. at 56, 106 S.Ct. at 2769. There are no absolute standards for gauging white bloc voting. This analysis requires a review of the extent to which white voters "bloc vote" for candidates of their choice, and assessing whether this pattern has the effect of minimizing the opportunities of minorities to participate in the system.

■ The experts compared election results for a twelve year period. In the two County Commissioner elections where the minority preferred candidate was an African–American, the candidates received low percentages of votes from the white community and secured higher levels of support from the African–American community. In the 1982 Democratic Primary for County Commissioner, the minority preferred candidate received 49% of the African–American vote and 0% of the white vote. The minority preferred candidate in the 1986 General Election for County Commissioner received 62% of the African–American vote and 32% of the white vote.

In the third County Commissioner election the white minority preferred candidate received 60% of the African–American ballots and 77% of the white votes. The minority candidate in this race received 40% of the African–American votes and 23% of the white votes.

■ When considering the limited number of endogenous elections, it is also appropriate to consider exogenous elections to prove racially polarized voting. *See, e.g., Jenkins v. Red Clay Consolidated School District Bd. of Education,* 4 F.3d 1103, 1130 (3d Cir.1993) ("an inability to offer statistical evidence on a large number of elections should not necessarily foreclose a voting rights claim"); *Citizens for a Better Gretna v. Gretna,* 834 F.2d 496, 503 (5th Cir.1987), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989) ("the use of exogenous elections in cases with 'spare relevant statistical data' " is appropriate, but plaintiffs also presented endogenous evidence); *McDaniels v. Mehfoud,* 702 F.Supp. 588, 593 (E.D.Va. 1988) (Racially polarized voting can be established through both anecdotal evidence and electoral analysis).

In the exogenous elections the minority preferred African–American candidates received high levels of African–American support and low levels of white support. The minority preferred candidate in the 1984 Democratic Primary for President received 79% of the African–American vote and only 5% of the white vote. In the 1986 Democratic Primary for Lieutenant Governor and Governor, the minority preferred candidate received 67% of the African–American vote and only 13% of the white vote. The preferred African–American candidate in the 1988 Democratic Primary for President, received 55% of the minority vote and only 4% of the white vote. In the 1986 General election for Judge of the Orphans' Court the minority preferred candidate received 44% of the African–American vote and 17% of the white vote.

In the other elections examined by the experts, the minority preferred candidates were white. In the 1978 General Election for Judge of Orphans Court, the minority preferred candidates received from 48% to 65% of the African–American vote and from 41% to 48% of the white vote. The minority preferred candidate, a white Democrat, in the 1988 General Election for United States Senator, received 60% of the African–American vote and 52% of the white vote. In the 1990 General Election for United States Senator, the minority candidate of choice received 70% of the African–American vote and 73% of the white vote.

■ Although all elections are relevant in determining white bloc voting, the elections in which the preferred minority candidate is an African–American are more probative. *See Gretna*, 834 F.2d at 503. Section 2 specifically provides that the section is violated if "members [of a protected class] have less opportunity than other members of the electorate to participate in the political process and to elect *representatives of their choice.*" 42 U.S.C. § 1973(b) (emphasis added).

■ In addition to reviewing statistics, the Court must consider additional factors to determine if the white bloc vote is legally significant. Several factors can influence a court's determination of whether white bloc voting is legally significant. *Gingles*, 478 U.S. at 56, 106 S.Ct. at 2769. If present, these other factors—the presence or absence of other potentially dilutive electoral devices, such as majority vote requirements, designated posts and prohibitions against single-shot voting, the number of seats open, and the number of candidates in the field, are supportive of the minority voters' claim. *Id.* at 48, n. 15, 106 S.Ct. at 2767, n. 15.

■ The current residency system employed by Worcester County requires individual minority candidates for County Commission to run one-on-one, county wide against individual white candidates. This system aggravates the political disadvantage of the County's minorities. *See Ward v. Columbus County*, 782 F.Supp. 1097, 1104 (E.D.N.C.1991). Even under the best of cir-

cumstances, the at-large system debases the value of the minority's political strength.

Another factor that shows whites vote as a bloc is that in the entire history of Worcester County, with a 20% African–American population, no African–American has won a county office in a county-wide head-to-head contest against a white candidate. *See Gingles*, 478 U.S. at 48 n. 15, 106 S.Ct. at 2767 n. 15 (one of the "most important" of the Senate Report factors in demonstrating inequality of electoral opportunity is "the extent to which minority group members have been elected to public office in the jurisdiction").

### 3. *White Crossover Voting*

The election results examined by the experts were not altered by the white crossover vote which was minimal. Based on Dr. Weber's analysis, the average white crossover vote in Worcester County was 19%. In a county that has a 20% African–American voting age population and an 80% white voting age population, the African–American candidate cannot win a residential post at-large election.

Dr. Arrington analyzed the probable outcome of a race where there is an African–American candidate opposed by a white candidate and there are high levels of cross over voting and minority cohesion. The results of the analysis support the conclusion that an African–American candidate will lose in county-wide elections.

The statistics taken together with the voting patterns and electoral system show that the white majority votes significantly as a bloc to enable it "usually to defeat the minority's preferred candidate," *Gingles*, 478 U.S. at 51, 106 S.Ct. at 2766–67, and that the plaintiffs have satisfied the third requirement for proving a cause of action under the Voting Rights Act when the inhibiting electoral device is a residential post, at-large election system.

### C. *Totality of the Circumstances*

■ This Court also examined the factors in the Senate Judiciary Committee Report accompanying the bill which amended § 2. Maryland and its political subdivisions bear a

history of official racial discrimination against African–Americans. The Maryland Constitution of 1867 limited the right to vote to white males. Until 1864, slavery was authorized by the state constitution. Until the Fifteenth Amendment to the United States Constitution was ratified in 1870, African–Americans were denied the right to vote under the state constitution. Maryland failed to ratify this Amendment.

Legal segregation affected African–Americans in many aspects of daily life in the early 1900s. During this period, laws which made property ownership a prerequisite to voting were enacted in the County. The judicially noticed facts also show a history of official resistance to desegregation in Worcester County. It did not fully desegregate its schools after the Supreme Court decided *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

Accordingly, under the totality of the circumstances, the current system for election to the Worcester County Commission interacts with past and present discrimination to deprive African–Americans of Worcester County the same "opportunity [as] other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b).

### Remedy

■ Once a violation of voting rights has been established the Court "should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." 1982 U.S.C.C.A.N. 208. However, in exercising its equitable powers, the Court should give the appropriate legislative body the first opportunity to provide a plan that remedies the violation. *See McGhee,* 860 F.2d at 115. If the legislative body fails to respond, or responds with a proposed remedy that constitutes a § 2 violation, then the Court must fashion an appropriate plan. *Id.*

■ The legislative body should not limit its discussion of a proposed plan to single member districts which is the traditional remedy for minority vote dilution cases.

Rather, it should also examine other schemes that will remedy vote dilution in Worcester County such as the modified multi-seat electoral systems, in particular, limited voting, cumulative voting and the single transferable vote. These are systems through which elections may be held in at-large districts without systematically diluting the votes of minorities. *See* Richard L. Engstrom, *Modified Multi–Seat Election Systems as Remedies for Minority Vote Dilution,* 21 Stetson L.Rev. 743 (1992); Richard L. Engstrom, *The Single Transferable Vote: An Alternative Remedy for Minority Vote Dilution,* 27 U.S.F.L.Rev. 781 (1993).

Accordingly, the Court will grant defendants 60 days to submit an acceptable remedial plan.

### *ORDER*

In accordance with the attached Memorandum, it is this 7th day of January, 1994, by the United States District Court for the District of Maryland, ORDERED:

1. That judgment BE, and the same IS, hereby ENTERED in favor of the Plaintiffs;

2. That the Defendants SUBMIT a proposed remedial plan within 60 days of the date of this Order; and

3. That a copy of this Memorandum and Order be mailed to counsel for the parties.