Honiss W. CANE, Jr., et al.

v.

WORCESTER COUNTY, MARYLAND, et al.

Civ. No. Y–92–3226.

United States District Court, D. Maryland.

April 4, 1994.

**370**

C. Christopher Brown, Baltimore, MD, and Deborah A. Jeon, Cambridge, MD, for plaintiffs.

James Richard Dennis Collins, Ocean City, MD, Edward H. Hammond, Jr., Ocean City, MD, and Benjamin E. Griffith, Cleveland, MS, for defendants.

## MEMORANDUM OPINION

JOSEPH H. YOUNG, Senior District Judge.

The pending question, premised on § 2 of the Voting Rights Act of 1965, as amended and extended, 42 U.S.C. § 1973, is whether the Court should adopt Bill 93–6, enacted by the defendants on May 18, 1993 or impose a court ordered plan.

### I.

Plaintiffs filed an action under § 2 of the Voting Rights Act of 1965 challenging the system used by Worcester County to elect county commissioners. By Memorandum Opinion, dated January 7, 1994, the Court held that the system utilized to elect the Worcester County Commission, the governing body of Worcester County, prevented minorities from electing a candidate of their choice.[1] *See Cane v. Worcester County,* 840 F.Supp. 1081, 1090 (D.Md.1994).

1. Defendants' appeal of this ruling was dismissed by the United States Court of Appeals for the Fourth Circuit on March 3, 1994.

2. Under Bill 93–6, the County Commission created the fifth residence commissioner district by dividing Commissioner Residence District No. 3, under the old system, between Berlin and Ocean

This Court's decision was based on the Worcester County electoral system that was used to elect the current county commission (the "old system"). Under this system, the entire electorate of Worcester County voted on candidates for each of the five seats. Four of the seats corresponded to the County's four residency districts. Candidates were required to reside in the appropriate district. The fifth member, the commissioner-at-large, was required to reside in the County, but was not subject to district residency requirements. The five candidates who received the most votes in the general election were elected to the Board. *Cane,* 840 F.Supp. at 1084–85.

Although the Court ordered the defendants to submit a proposed remedial plan by March 8, 1994, by letter dated February 23, 1994, defendants' counsel indicated that their proposed remedial plan "was embodied in Bill 93–6, which the Court did not consider or evaluate in its January 7, 1994, Memorandum Opinion." Bill 93–6 (the "new system") was enacted on May 18, 1993, six months after the complaint in this case was filed. No elections have been held since its enactment.

Bill 93–6 eliminated the commissioner-at-large position and created a fifth commissioner residence district based on the 1990 census data.[2] In the "Legislative Findings" of the Bill, the County Commission found that a fifth population center had developed and this change in the population patterns warranted the creation of this fifth commissioner residence district.

On March 11, 1994, plaintiffs proposed two remedial plans and filed a Motion for Adoption of the Plan. Plaintiffs contend that the defendants waived their opportunity to participate in the remedial process because they failed to submit an acceptable remedial plan. Accordingly, plaintiffs ask this Court to order the defendants to adopt one of these

Pines. The new residence commissioner district includes St. Martin and Ocean Pines and is titled Commissioner Residence District No. 5. Residence Commissioner District No. 3, under Bill 93–6, includes Berlin and the surrounding area. The other three residence commissioner districts remained the same under Bill 93–6.

proposed plans.[3] The defendants contend that Bill 93–6 is legally acceptable.

On March 25, 1994, the Court heard arguments on the proposals. The defendants rejected plaintiffs' two proposals as legally unacceptable and stated that, if the Court deems the plans acceptable, the defendants have no preference as to either plan, and that they would not submit any remedial plans. The plaintiffs argued that Bill 93–6 was implicitly found violative of § 2 in the Court's Memorandum Opinion and that it was not an acceptable remedial plan.

## II.

■ After a federal court has found a violation of § 2 of the Voting Rights Act and provides the appropriate legislative body the first opportunity to devise an acceptable remedial plan, "the court's ensuing review and remedial powers are largely dictated by the legislative body's response." *McGhee v. Granville County,* 860 F.2d 110, 115 (4th Cir.1988). If the legislative body responds with a legally unacceptable remedy or fails to respond, the court must fashion a remedy. *Id.; see Chapman v. Meier,* 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975); *Seastrunk v. Burns,* 772 F.2d 143, 151 (5th Cir.1985). The plan is legally unacceptable if it fails to remedy the particular dilution violation, *McGhee,* 860 F.2d at 118, and fails to conform to § 2 of the Voting Rights Act. *Dillard v. Crenshaw County,* 831 F.2d 246, 249 (11th Cir.1987); *see Upham v. Seamon,* 456 U.S. 37, 43, 102 S.Ct. 1518, 1522, 71 L.Ed.2d 725 (1982). The proposed system must be measured by the historical record, the difference from the old system, and by prediction. *Dillard,* 831 F.2d at 250.

Worcester County has a population of approximately 35,028, 21.26% of whom are black and are concentrated in four areas of the county: Pocomoke, Stockton, Snow Hill and Berlin. Its current county commission was elected by an electoral system consisting of one member from each of the four residency districts and a fifth member, the commissioner-at-large, not subject to the district residency requirement. All five members are elected at-large. Under Bill 96–3 the county commission consists of one commissioner from each of the five residency districts which are elected at-large. It eliminated the commissioner-at-large.

In its January 7 Memorandum Opinion, this Court found that since the 1860's the State of Maryland and some of its political subdivisions have discriminated against blacks by resisting desegregation and employing mechanisms that prevented them from having the same opportunity to vote as other members of the electorate. *Cane,* 840 F.Supp. at 1091. The Court also found that the black population of Worcester County is politically cohesive and a geographically insular minority group, *Id.* at 1087–89, and that even where there are high levels of crossover voting and minority cohesion, black candidates will be defeated. *Id.* at 1090. Finally, in Worcester County no black candidate has won a county office in a county-wide head-to-head contest against a white candidate.

■ The evidence is clear and convincing that due to the voting patterns, the residential at-large requirements and the past and present discrimination of blacks, their voting strength is diluted. Any effective cure for this § 2 violation must therefore reach not only the commissioner-at-large, which Bill 96–3 eliminated, but it must re-

---

**3.** Plan A: A single-member district arrangement with one black majority district. Referred to as District Plan I in the Court's January 7, 1994 Memorandum Opinion. *Cane,* 840 F.Supp. at 1086. Under this Plan, the candidates for the five-member Board must be residents of the district from which they seek election, and only those voters who reside within the district are eligible to vote for candidates seeking election from that district. The candidate who receives the most votes in each district is elected to the Commission.

Plan B: A cumulative voting plan. An at-large election system in which five Commissioners are elected by all registered voters within the County. Each voter may cast up to five votes in a Commission election, and may cumulate his or her votes for one or more chosen candidates. Winning candidates are the top five who receive the most votes of all Commission candidates seeking office.

move the dilutive aspect of the old system. Bill 96–3 does not do this.

Bill 93–6 merely eliminated the commissioner-at-large, created a fifth commissioner district in the Ocean Pines area and retained the at-large, residential electoral system. Blacks will continue to run one-on-one, county-wide, under Bill 93–6. In essence, the blacks' opportunity to elect a candidate of their choice is no better than the old system.[4] Thus, the distinction between Bill 93–6 and the old system does not remedy the dilution violation under § 2 of the Voting Rights Act. Indeed, Bill 93–6 violates § 2.

Defendants argue that the plaintiffs must introduce competent evidence demonstrating that Bill 93–6 is unacceptable and that it is improper to compare it to the old electoral system. Such a review is impossible because there have been no elections under Bill 93–6.

### III.

■ Bill 93–6 is legally unacceptable and the defendants refuse to offer a remedial plan or express a preference for either of the plaintiffs' proposed plans. Accordingly, this Court must use its remedial authority under § 2 of the Voting Rights Act to impose a court-ordered plan.

A district court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future. Once a right and a violation has been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.

*United States v. Paradise*, 480 U.S. 149, 183–84, 107 S.Ct. 1053, 1072–74, 94 L.Ed.2d 203 (1987) (internal quotations and citations omit-

ted). This power is limited by the nature and extent of defendants' violations.

The plaintiffs have proposed two remedial plans: Plan A, single-member districts with a black majority district, and Plan B, cumulative voting. Since neither of the plaintiffs' proposals violate § 2, the issue is whether, based on the voting patterns in Worcester County, the blacks will have an opportunity to elect a candidate of their choice. In determining whether the plaintiffs' proposed plans offer such an opportunity, the Court will apply the coefficient called the threshold of exclusion.[5]

Under the single-member district plan one of the five districts would have a black voting age population of 62%. The threshold of exclusion is more than 50%. With a majority-vote requirement, any group that constitutes more than 50% of the electorate in that district is guaranteed that its preferred candidate will win. Thus, blacks would have a realistic opportunity to elect a candidate of their choice in the district where they have a majority.

Under the cumulative voting arrangement, the threshold of exclusion is 16.7%.[6] Thus, any group that constitutes more than 16.7% of the voters can elect a candidate if they cumulate their votes for that candidate. If 1,000 electors vote for five positions, and if only five candidates are preferred by the majority, with an evenly split vote, a minority would need only 835 of the 5,000 votes, to elect the candidate of their choice. Because the black voting age population in the county is 19.16%, cumulative voting offers them the opportunity to elect a candidate of their choice.

■ However, the coefficient should not be applied in a vacuum. It is incumbent upon this Court to give great deference to legislative judgments about the nature and

---

**4.** Even if, under Bill 93–6, the newly created Commissioner District No. 5 and the modified Commissioner District No. 3 has a black majority voting age population, it does not increase the minority's opportunity for electing a candidate of its choice.

**5.** This coefficient identifies the percentage of the electorate that any group must exceed to elect a candidate of its choice regardless of how the rest of the electorate votes. Richard L. Engstrom,

*Modified Multi–Seat Election Systems as Remedies for Minority Vote Dilution,* 21 Stetson L.Rev. 743, 750 (1992)

**6.** The threshold of exclusion in a cumulative voting arrangement is dependent on the number of seats to be filled in a given election. It may be calculated through the following formula:

$$\frac{1}{1 + \# \text{ of seats}}.$$

scope of the proposed remedy, *see McGhee,* 860 F.2d at 115; *Thornburg v. Gingles,* 478 U.S. 30, 78–79, 106 S.Ct. 2752, 2780–81, 92 L.Ed.2d 25 (1986), and to reconcile the requirements of the statute with the goals of county political policy. *See Connor v. Finch,* 431 U.S. 407, 414, 97 S.Ct. 1828, 1833, 52 L.Ed.2d 465 (1977).

In the "Legislative Findings" of Bill 93–6, the Worcester County Commission expressed a preference for an at-large electoral system because of the long history and tradition, and the importance and value of allowing all the citizens to vote for all the candidates for County Commission. (Bill 93–6, Para. 1, 3). The County Commissioners who testified during the trial wanted to avoid creating a single-member district with a black majority because it would cause County Commissioners to identify with the interests of a particular geographic area.

Cumulative voting would not disturb the existing structure of government in Worcester County. Each candidate must run in the district as a whole and there is little political advantage in becoming identified with the interest of a particular locality. Thus, cumulative voting is a less drastic remedy than the single-member district plan.

The County Commission also found that dividing a municipality into two districts or combining two municipalities into the same district would be disadvantageous to common interests. (Bill 93–6, Para. 9). Instead, the County Commission expressed a preference for retaining the traditional residential election districts.

Cumulative voting, unlike single-member districts, will allow the voters, by the way they exercise their votes, to "district" themselves based on what they think rather than where they live. Thus, cumulative voting is less intrusive than single-member districts and would not require the county to divide or combine its municipalities for district purposes.

Finally, the County Commissioners wanted the successful candidates to reflect the collec-

tive interests of a greater number of citizens resulting from a county-wide election. This, the Commission contended, minimizes the likelihood of electing candidates who may not be interested in addressing all the diverse and varied issues before it. (Bill 93–6, Para. 9).

Cumulative voting is less likely to increase polarization between different interests since no group receives special treatment at the expense of others as would occur in a single-member district with one black majority district. It permits the blacks in Worcester County to achieve representation when their overall size and identity of interests are sufficient to elect a candidate. Unlike the single-member district plan, the cumulative voting plan is consistent with the county political policy goals and, also provides blacks with an opportunity to elect a candidate of their choice.

### IV.

Under different facts, the Fourth Circuit has suggested that single-member districts are the only appropriate remedy in § 2 cases under a court-ordered plan. *McGhee v. Granville County,* 860 F.2d 110 (4th Cir. 1988). In *McGhee,* the parties had stipulated that the Granville County at-large method of electing members to its County Commission violated § 2 of the Voting Rights Act. After the parties failed to agree to a remedy, the district court rejected the County's proposed single-member district plan and instead ordered a modified version of the plaintiff's responsive proposal for a plan based upon "limited voting" [7] in at-large elections. When the plaintiffs challenged at-large elections that prevented black candidates from being elected, the court found the preferred remedy was to create single-member districts in which black candidates were likely to be elected. *McGhee,* 860 F.2d at 118–20; *see League of United Latin American Citizens v. Clements,* 999 F.2d 831 (5th Cir.1993) (cumulative voting mechanisms preserve at-large elections, but are not remedies for the

---

**7.** Limited voting, like cumulative voting, is a modified multi-seat election system. Under limited voting, the number of seats to be filled in an election exceeds the number of candidates for whom each voter may vote. Limited voting thus promotes minority representation in many cases by preventing the majority from filling all the seats.

particular structural problem that the plaintiffs have chosen to attack).

Here, the defendants did not concede liability based on the complaint as did the defendants in *McGhee*. Instead, this Court had the opportunity to assess the presentation of the evidence and demeanor of the witnesses, and judge their credibility, allowing the Court to reach a conclusion as to the aspect of the electoral system that violated § 2.

██ Further, the *McGhee* decision was based on the proposition that single-member districts are the only appropriate remedy when an at-large election system violates § 2. However, the factual findings lead this Court to conclude that under the totality of the circumstances, the current system for election to the Worcester County Commission interacted with past and present discrimination to deprive blacks an opportunity to elect candidates of their choice. *Cane*, 840 F.Supp. at 1091. This Court did not find that one particular aspect of the electoral system violated § 2. Thus, unlike *McGhee*, the court-imposed remedy will eliminate the discriminatory part of the county electoral system, the voting rule itself, and retain the part that is permissible, the underlying multimember district and the form of the elected body. *See Upham*, 456 U.S. at 43, 102 S.Ct. at 1522 (the court-imposed remedy is limited to those modifications of the current plan that are necessary to cure any statutory defect).

Finally, because the defendants have not proposed a legally adequate remedial plan and did not submit any other proposals or express a preference for the plaintiffs' proposals, this Court's remedial powers, unlike the court in *McGhee*, are not limited to the legislative body's response. *See McGhee*, 860 F.2d at 115. Therefore, the county will be ordered to impose a cumulative voting system to elect its county commission.[8]

### ORDER

In accordance with the attached Memorandum, it is this 4th day of April, 1994, by the United States District Court for the District of Maryland, ORDERED:

1. That Plaintiff's Motion for Adoption of Plaintiffs' Proposed Remedial Plan BE, and the same IS, hereby GRANTED;

2. That the defendants amend the election system for the primary and general elections for Worcester County Commission in accordance with the attached Memorandum and begin implementation of a cumulative voting system within sixty (60) days.

---

8. Cumulative voting satisfies the basic "one person, one vote" rule in that every individual voter is allocated an equal number of votes.