35 F.3d 921
 63 USLW 2171
 Honiss W. CANE, Jr., Plaintiff-Appellee,
v.
WORCESTER COUNTY, MARYLAND; George M. Hurley; John E.
Bloxom; Reginald T. Hancock; Floyd F. Bassett;
Jeanne Lynch, Members, Worcester County
Board of Commissioners,
Defendants-Appellants,
and
George H. Dryden; Hinson Finney; Mark Frostrom, Defendants.
Washington Legal Foundation; Center for Voting and
Democracy; United States of America, Amici Curiae.
 No. 94-1579.
 United States Court of Appeals,
Fourth Circuit.
 Argued July 21, 1994.
Decided Sept. 16, 1994.
 
 ARGUED: Benjamin E. Griffith, Griffith & Griffith, Cleveland, MS, for appellants. Charles Christopher Brown, Brown, Goldstein & Levy, Baltimore, MD, for appellee. ON BRIEF: Edward H. Hammond, Jr., Williams, Hammond, Moore, Shockley & Harrison, P.A., Ocean City, MD, for appellants. Deborah A. Jeon, American Civ. Liberties Union Foundation of Maryland, Centreville, MD, for appellee. Pamela Karlan, Charlottesville, VA; Edward Still, Birmingham, AL, for amicus curiae Center for Voting and Democracy; Deval L. Patrick, Asst. Atty. Gen., Jessica Dunsay Silver, Mark L. Gross, U.S. Dept. of Justice, Washington, DC, for amicus curiae U.S.
 Before WILKINS and WILLIAMS, Circuit Judges, and ANDERSON, United States District Judge for the District of South Carolina, sitting by designation.
 Affirmed in part, reversed in part, and remanded by published opinion. Judge WILKINS wrote the opinion, in which Judge WILLIAMS and Judge GEORGE ROSS ANDERSON joined.OPINION
 WILKINS, Circuit Judge:
 
 
 1
 Honiss W. Cane, Jr. and others[1] brought this action on behalf of all African-American residents of Worcester County, Maryland (collectively "Plaintiffs"), claiming that the at-large system used to elect members of the County Board of Commissioners ("the Board") diluted the voting strength of African-Americans in violation of Sec. 2 of the Voting Rights Act of 1965, as amended June 29, 1982.[2] See 42 U.S.C.A. Sec. 1973 (West Supp.1994) (Voting Rights Act). The district court found that the at-large electoral system violated Sec. 2 and ordered the County to implement a cumulative voting system within 60 days. The County appeals, arguing that the district court erred in finding that the electoral scheme violated Sec. 2 and in adopting a cumulative voting plan as a remedy. We conclude that the findings of the district court regarding the Sec. 2 violation are not clearly erroneous, but that the court abused its discretion by ordering the County to implement the cumulative voting scheme proposed by Plaintiffs. Therefore, we affirm in part, reverse in part, and remand for further proceedings.
 
 I.
 
 2
 Worcester County is a predominantly rural county on the southeastern shore of Maryland bordering Delaware and Virginia. According to the 1990 Census, the County's total population is 35,028, of which 7,448 (or 21.26%) are African-American. The voting age population of the County is 27,331, of which 5,237 (or 19.16%) are African-American. The County's African-American population is concentrated in the communities of Pocomoke, Stockton, Snow Hill, and Berlin.
 
 
 3
 The Board is composed of five commissioners and serves as the legislative and executive body of the County. When this action was filed in November 1992, County law provided that the commissioners of the Board be elected at large under a residency district system. The County was divided into four residency districts, and four commissioners were required to reside in the residency district corresponding to the Board seat for which they were elected. The fifth member was a commissioner-at-large, who was required to be a resident of the County but was not required to reside in any particular district.
 
 
 4
 In May 1993, after this action was filed but before the first hearing was held, the Board passed Bill 93-6, which amended the voting scheme for electing commissioners to the Board. The revised plan maintained the at-large electoral scheme, but divided the County into five residency districts, eliminating the commissioner-at-large position and establishing a fifth designated post. The legislative findings accompanying Bill 93-6 indicate that the Board determined that a fifth population center had developed and that this change in population patterns warranted the creation of the fifth residency district.
 
 
 5
 After conducting a bench trial on the merits, the district court issued a memorandum opinion dated January 7, 1994, containing its findings of fact and conclusions of law. Cane v. Worcester County, Md., 840 F.Supp. 1081 (D.Md.1994). The district court concluded that the County's former electoral scheme violated Sec. 2 of the Voting Rights Act and ordered the County to submit a remedial plan within 60 days. Id. at 1091. The County advised the district court that it believed that its then current plan, embodied in Bill 93-6, met all constitutional and statutory voting rights requirements.
 
 
 6
 Plaintiffs submitted two proposed remedial plans and moved for the district court to adopt one of them. The first plan proposed by Plaintiffs, Plan A, provided for a single-member district system composed of five districts with one of the five districts being a majority African-American district. Voters would cast one vote for a candidate running in the district in which they reside. The candidate receiving the most votes in each of the five districts would be declared the winner.[3] The second plan, Plan B, proposed a cumulative voting system pursuant to which all candidates would run in a countywide at-large election. Each voter would be allowed to cast five votes and to allocate all of them to one candidate or divide them among several candidates. The five candidates receiving the most votes among all of those offering for election would win a seat on the Board.[4]
 
 
 7
 The district court concluded that the County's current plan, embodied in Bill 93-6, was legally unacceptable because it failed to remedy the established Sec. 2 violation. Cane v. Worcester County, Md., 847 F.Supp. 369, 371-72 (D.Md.1994). Relying on the County's preference for an at-large electoral scheme expressed in the legislative findings of Bill 93-6, the court then ordered the County to implement Plan B, the cumulative voting scheme proposed by Plaintiffs. Id. at 373-74.[5]
 
 II.
 
 8
 Section 2 of the Voting Rights Act prohibits any "qualification or prerequisite to voting or standard, practice, or procedure ... which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or membership in a language minority group. 42 U.S.C.A. Sec. 1973(a). A denial or abridgement of the right to vote in violation of Sec. 2 is established when:
 
 
 9
 [B]ased on the totality of circumstances, it is shown that the political processes leading to nomination or election ... are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 
 
 10
 42 U.S.C.A. Sec. 1973(b).
 
 
 11
 In order to prove that the use of a multimember district dilutes their votes in violation of Sec. 2, members of a protected minority group must establish three "necessary preconditions." Thornburg v. Gingles, 478 U.S. 30, 50-51, 106 S.Ct. 2752, 2766-67, 92 L.Ed.2d 25 (1986). "First, the minority group must be ... sufficiently large and geographically compact to constitute a majority in a single-member district." Id. at 50, 106 S.Ct. at 2766. "Second, the minority group must be ... politically cohesive." Id. at 51, 106 S.Ct. at 2766. And third, the majority must vote "sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate." Id.
 
 
 12
 Once the three preconditions set forth in Gingles are established, the trier of fact must determine whether, based on a totality of circumstances, the use of a multimember district violates Sec. 2. See Johnson v. De Grandy, --- U.S. ----, ----, 114 S.Ct. 2647, 2657, 129 L.Ed.2d 775 (1994). The essence of this inquiry is whether the "electoral ... structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and [majority] voters to elect their preferred representatives." Gingles, 478 U.S. at 47, 106 S.Ct. at 2764. Factors relevant to the analysis include, but are not limited to: (1) a history in the state or political subdivision of official voting-related discrimination against the minority group; (2) the extent of racial polarization in the elections of the state or political subdivision; (3) the extent to which the state or political subdivision has used voting practices or procedures that enhanced the opportunity for discrimination against the minority group; (4) the exclusion of minority group members from the candidate slating processes; (5) the extent to which past discrimination in areas such as education, employment, and health hinder the ability of members of the minority group to participate effectively in the political processes; (6) the use of racial appeals in political campaigns; (7) the extent to which minority group members have been elected to public office in the relevant jurisdiction; (8) whether elected officials exhibit a significant lack of responsiveness to the particularized needs of minority group members; and (9) whether the policies offered to justify the challenged voting practice are tenuous. Id. at 44-45, 106 S.Ct. at 2763-64 (citing S.Rep. No. 417, 97th Cong., 2d Sess. 28-29 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 206-07). While each of these factors may be probative, no single factor or combination of factors is dispositive. Id. at 45, 106 S.Ct. at 2763-64. The ultimate finding of a district court that based on the totality of the circumstances an election scheme dilutes minority voters' ability to participate in the political process and to elect representatives of their choice in violation of Sec. 2 is a factual finding subject to a clearly erroneous standard of review. Id. at 78-79, 106 S.Ct. at 2780-81.
 
 A.
 
 13
 In its analysis of the first Gingles precondition, the district court reviewed two alternative single-member district plans submitted by Plaintiffs. Cane, 840 F.Supp. at 1086. It noted that because the African-American population was spread across several different regions of the County, the construction of a majority African-American district would necessarily entail the running of commissioner district lines across election districts and through at least two municipalities. See id. at 1086-87. However, the court determined that it was possible to construct a majority African-American district that was "not unreasonably irregular in shape" because the African-American population was concentrated in several small pockets. Id. at 1086. Noting that the first plan submitted by Plaintiffs did "not rely on districts that run through several 'tentacle-like corridors' nor [we]re the district[s'] boundary lines so unreasonably irregular, bizarre or uncouth as to approach obvious gerrymandering," the district court specifically found that although the resulting districts were not symmetrical, they were compact. Id. at 1087. In sum, the district court found that the African-American voters of Worcester County were a sufficiently large and geographically compact group to create a majority African-American district under a single-member district voting scheme.
 
 
 14
 With respect to the second Gingles precondition, the district court first noted that the two statistical methods used by the parties' experts to evaluate voting behavior in Worcester County failed to produce reliable statistical evidence because of the lack of available data and a truncated analysis caused by the small number of districts and lack of a majority African-American district. Id. at 1087-88. The court then proceeded to review the results of both endogenous and exogenous elections, concluding that African-Americans exhibited a significant degree of political cohesion when consideration was given to the race, political party, and experience of individual candidates. See id. at 1087-89. Further, the evidence showed that in towns in Worcester County that had converted from an at-large to a single-member district electoral system, an African-American was elected to the town councils from the newly created majority African-American districts. Id. at 1088. Finally, the court noted that the African-American population in the County is politically active, providing substantial support to the local chapter of the NAACP and causes of interest to the African-American community. Id. at 1089. Based on this evidence, the district court found that African-Americans in Worcester County are politically cohesive. Id.
 
 
 15
 In its analysis of the third and final Gingles precondition, the district court first reviewed the results of the two County commissioner elections in which the minority-preferred candidate was an African-American. Id. In each of these elections, the minority-preferred candidate received only a small percentage of the white vote. Id. A review of exogenous elections demonstrated similar voting patterns: The minority-preferred candidates in both national and local elections generally received a small percentage of the vote from white voters in Worcester County. Id. at 1089-90.
 
 
 16
 The court concluded that this evidence of white bloc voting was legally significant due to the structure of the scheme for electing commissioners to the Board. Id. at 1090. Under the at-large residency district system, minority candidates were required to run one-on-one, countywide against individual white candidates. Even taking into consideration the white crossover vote, which averaged 19 percent, the court found that the at-large electoral system debased the value of African-American political strength because the combined African-American and white-crossover vote would be unable to elect an African-American candidate. This conclusion was supported by evidence that in the history of Worcester County an African-American candidate has never won a countywide, head-to-head contest against a white candidate. Id.
 
 
 17
 Once it found that the three Gingles preconditions were satisfied, the district court reviewed other factors in determining whether, under a totality of circumstances, the system of electing commissioners to the Board violated Sec. 2. Id. at 1090-91. The court specifically noted that African-Americans were denied the right to vote in Maryland until 1870 and that in the early 1900s the State employed voting prerequisites that enhanced the opportunity for discrimination against African-Americans. Id. at 1091. Taking into consideration these factors and those discussed above, the court concluded that "under the totality of the circumstances, the current system for election to the Worcester County Commission interacts with past and present discrimination to deprive African-Americans of Worcester County the same 'opportunity [as] other members of the electorate to participate in the political process and to elect representatives of their choice.' " Id. (alteration in original) (quoting 42 U.S.C.A. Sec. 1973(b)).
 
 B.
 
 18
 Having carefully reviewed the record, we are unable to conclude that the district court was clearly erroneous in finding that the use of an at-large residency district system for electing commissioners to the Board impermissibly diluted the votes of African-Americans.[6] Accordingly, we affirm its conclusion that the former electoral scheme violated Sec. 2 of the Voting Rights Act.
 
 III.
 
 19
 Once a violation of Sec. 2 of the Voting Rights Act has been established, a district court should give the appropriate legislative body the first opportunity to devise a remedial plan. McGhee v. Granville County, N.C., 860 F.2d 110, 115 (4th Cir.1988). The ensuing review by and the remedial powers of the district court are largely dictated by the action taken by the legislative body. Id. When the legislative body responds with a proposed remedy, the "court may not thereupon simply substitute its judgment of a more equitable remedy for that of the legislative body; it may only consider whether the proffered remedial plan is legally unacceptable." Id. If the proposed remedial plan is legally acceptable, then the district court must "accord great deference to legislative judgments about the exact nature and scope of the proposed remedy, reflecting as it will a variety of political judgments about the dynamics of an overall electoral process that rightly pertain to the legislative prerogative of the state and its subdivisions." Id. "If the legislative body fails to respond or responds with a legally unacceptable remedy, the responsibility falls on the District Court to exercise its discretion in fashioning a near optimal plan." Id. (citations and internal quotation marks omitted).
 
 A.
 
 20
 The County asserts that the district court erred in concluding that Bill 93-6 was a legally unacceptable plan. A proposed plan is a legally unacceptable remedy if "it violates ... constitutional or statutory voting rights--that is, [if] it fails to meet the same standards applicable to an original challenge of" an electoral scheme. Id. Bill 93-6 altered the former electoral scheme by eliminating the commissioner-at-large position and creating a fifth residency district. Each of the five commissioners of the Board were still elected at-large. This amendment of the County's electoral scheme did not remedy the system's dilution-by-submergence effect because it retained at-large voting--the structural cause of the vote dilution. As conceded by the County at oral argument, minority-preferred candidates are no more likely to win a seat on the Board under the scheme established by Bill 93-6 than they were under the former electoral scheme. Bill 93-6 is not a legally acceptable remedy and the district court properly rejected it.
 
 B.
 
 21
 With respect to the remedy imposed by the district court, the County principally argues that cumulative voting is a radical departure from traditional elections systems, and thus, it may not be judicially imposed to remedy a Sec. 2 violation. Justice Thomas recently suggested that "nothing in our present understanding of the Voting Rights Act places a principled limit on the authority of federal courts that would prevent them from instituting a system of cumulative voting as a remedy under Sec. 2." Holder v. Hall, --- U.S. ----, ----, 114 S.Ct. 2581, 2601, 129 L.Ed.2d 687 (1994) (Thomas, J., dissenting). We are not called upon to outline whether facts and circumstances might justify the imposition of a cumulative voting plan on a political subdivision. Our review is limited by the specific facts and circumstances presented here, and under them, the district court abused its discretion in adopting the cumulative voting scheme proposed by Plaintiffs.
 
 
 22
 As noted above, we stated in McGhee that if the remedial plan proposed by the appropriate legislative body is legally acceptable, the district court must "accord great deference to legislative judgments about the exact nature and scope of the proposed remedy." 860 F.2d at 115. Because the plan proposed by the County in McGhee was legally acceptable, we did not reach the issue of the degree of deference the court must accord legislative judgments in exercising its discretion to fashion a remedy when the legislative body fails to propose a remedy or its proposed remedy is legally unacceptable. We are confronted with that issue here and conclude that even when the legislative body fails to offer a remedy or its proposed remedy is legally unacceptable, the court, in exercising its discretion to fashion a remedy that complies with Sec. 2, must to the greatest extent possible give effect to the legislative policy judgments underlying the current electoral scheme or the legally unacceptable remedy offered by the legislative body. See White v. Weiser, 412 U.S. 783, 793-96, 93 S.Ct. 2348, 2353-55, 37 L.Ed.2d 335 (1973) (holding that the district court, after properly rejecting the reapportionment plan adopted by the legislature, erred in ignoring legislative districting policy and failing to implement a reapportionment plan "which most clearly approximated the reapportionment plan of the state legislature, while satisfying constitutional requirements"); see also Whitcomb v. Chavis, 403 U.S. 124, 160-61, 91 S.Ct. 1858, 1878, 29 L.Ed.2d 363 (1971) (holding that the district court erred in fashioning a plan that rejected state policy choices more than was necessary to remedy the specific constitutional violations involved).
 
 
 23
 In reviewing the two plans submitted by Plaintiffs, the district court recognized its obligation "to give great deference to legislative judgments about the nature and scope of the proposed remedy and to reconcile the requirements of the statute with the goals of county political policy." Cane, 847 F.Supp. at 372-73 (citations omitted). The court provided two justifications for its selection of Plan B, the cumulative voting plan. First, it concluded that permitting all of the citizens to vote for all of the candidates would promote the County's desire to have commissioners serve the collective interest of the County by requiring the candidates to appeal to all of the voters in the County. Id. at 373. Second, it noted that Plan B would avoid the creation of districts that split or combined municipalities. Id.
 
 
 24
 However, the district court failed to give due deference to another legislative judgment set forth in the record. The County clearly expressed a preference for residency requirements that would ensure that the Board members were knowledgeable of and responsive to the diverse interests of the various regions of the County. The legislative findings accompanying Bill 93-6 provided that "[t]he Maryland General Assembly has recognized the desirability of, and Worcester County has for almost two centuries been well served by, having the governing body of the County representative of the distinct southern, central, and northern areas of the County." Since 1798, the County government has been structured to allow the members of the County's governing body to "be disbursed as equally as may be throughout the County." In amending the district system to add a fifth residency district, the Board explained that:
 
 
 25
 The best interests of the citizens in each of the different areas of the County can be best served by ... retaining the existing four commissioner residence districts with the creation of a new fifth commissioner residence district from a portion of the existing Commissioner District No. 3 so that there shall be one Commissioner from each of the population centers, or surrounding area, who shall be familiar with and knowledgeable of the people, conditions, needs and concerns of that particular section of the County.
 
 
 26
 In adopting the cumulative voting plan set forth in Plan B, the district court failed to defer to this expressed legislative preference. It abolished the residency districts, imposing a plan that would permit all five seats on the Board to be filled by individuals living in the same general area of the County. In sum, it failed to adequately defer to the "variety of political judgments about the dynamics of [the] overall electoral process that rightly pertain to the legislative prerogative of" the County. McGhee, 860 F.2d at 115.
 
 IV.
 
 27
 When a political subdivision fails to submit a legally acceptable proposed remedy, the appropriate course for the district court to follow is to fashion a remedy that complies with Sec. 2 and effectuates to the greatest extent possible the policy judgments expressed by the County. However, here the district court failed to rule on the legality of the scheme set forth in Bill 93-6--the electoral system in effect at the time the matter was pending before the court. Therefore, the County was not advised that its current electoral system, Bill 93-6, violated Sec. 2 when it was directed to submit a proposed remedy.[7] For this reason, we conclude that the proper course of action is to remand to the district court with instructions to afford the County an opportunity to submit a proposed plan of its choosing that remedies the Sec. 2 violation.[8]
 
 
 28
 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
 
 
 
 [1]
 The other named Plaintiffs include Fannie Birckhead, James L. Purnell, Sr., Saunders Marshall, Edward V. DeShields, William Waters, Gabriel L. Purnell, the Worcester County Voting Rights Coalition, and the Worcester County Branch of the NAACP
 
 
 [2]
 In addition to the County, Plaintiffs brought this action against the members of the Worcester County Board of Commissioners, George M. Hurley, John E. Bloxom, Reginald T. Hancock, Floyd F. Bassett, and Jeanne Lynch, as well as George H. Dryden, Hinson Finney, and Mark Frostrom--members of the Board of Supervisors of Elections for Worcester County
 
 
 [3]
 The district court summarized Plan A as follows:
 A single-member district arrangement with one black majority district.... Under this Plan, the candidates for the five-member Board must be residents of the district from which they seek election, and only those voters who reside within the district are eligible to vote for candidates seeking election from that district. The candidate who receives the most votes in each district is elected to the Commission.
 Cane v. Worcester County, Md., 847 F.Supp. 369, 371 n. 3 (D.Md.1994).
 
 
 [4]
 The text of Plan B provides:
 A cumulative voting plan--an at-large election system in which five Commissioners are elected by all registered voters within the County. Each voter may cast up to five votes in Commission elections, and may cumulate his or her votes for one or more chosen candidates. Winning candidates are the top five vote-getters of all Commission candidates vying for office, elected by a simple plurality of votes. The cumulative voting plan applies both to primary elections and general elections for Worcester County Commission.
 
 
 [5]
 While the opinion of the district court is not clear regarding the treatment of the residency districts, the parties agreed at oral argument that the residency districts were abolished under the cumulative voting plan imposed by the district court
 
 
 [6]
 With respect to the finding of a Sec. 2 violation by the district court, the County principally contends that Plaintiffs have failed to satisfy the first Gingles precondition of geographical compactness because the creation of a single-member majority African-American district would require district lines to be drawn solely on the basis of race--a practice condemned by the Supreme Court in Shaw v. Reno, --- U.S. ----, ----, 113 S.Ct. 2816, 2827, 125 L.Ed.2d 511 (1993), as "altogether antithetical to our system of representative democracy." However, the Court in Shaw upheld the intentional use of race in the redistricting process, recognizing that "redistricting differs from other kinds of state decisionmaking in that the legislature always is aware of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors." Id. at 2826. The Court concluded that race consciousness in the redistricting process constitutes impermissible race discrimination only when "traditional districting principles" are ignored and the resulting districts are so geographically bizarre that they are explainable only as an act of racial segregation. Id. --- U.S. at ---- - ----, 113 S.Ct. at 2827-30
 The County asserts that the creation of a majority African-American district would ignore traditional districting principles because it would require the division of at least two municipalities. However, simply because district lines may be drawn "to maintain the integrity of political subdivisions," id. --- U.S. at ----, 113 S.Ct. at 2826, does not mean that a proposed majority-minority district that would divide municipalities fails to comply with traditional districting principles, see Clark v. Calhoun County, Miss., 21 F.3d 92, 96 (5th Cir.1994) (concluding that plaintiffs had not necessarily failed to prove the first Gingles precondition of geographical compactness solely because the creation of a majority-minority district would require the division of three separate municipalities). The undisputed evidence indicated that the single-member district plans proposed by Plaintiffs adhered to other traditional districting principles such as the historical north-south division of the County and the natural boundaries created by County waterways. In addition, the uncontradicted evidence before the district court revealed that the citizens within the proposed majority African-American district shared common socioeconomic and political concerns. See Shaw, --- U.S. at ----, 113 S.Ct. at 2827. Drawing districts based on such common interests is perhaps one of the most often invoked districting principles. See, e.g., Gaffney v. Cummings, 412 U.S. 735, 752-53, 93 S.Ct. 2321, 2331-32, 37 L.Ed.2d 298 (1973). Finally, the shape of the proposed majority African-American district is not geographically bizarre. Rather, it is similar in appearance to one of the former residency districts under Bill 93-6 and the County's prior electoral scheme. Thus, we find meritless the County's assertion that the geographical compactness finding of the district court violates the dictates of Shaw.
 
 
 [7]
 As we noted above, Bill 93-6 and the County's former electoral system are structurally identical for purposes of a Sec. 2 analysis. Therefore, we need not remand the case to allow the district court to find in the first instance that Bill 93-6 violates Sec. 2
 
 
 [8]
 At oral argument, the County expressed a strong preference for a single-member district plan, assuming the finding of a violation was upheld. It indicated that it had previously failed to express a preference between the two plans submitted by Plaintiffs because it interpreted our decision in Neal v. Harris, 837 F.2d 632 (4th Cir.1987), as holding that any such concession would constitute a binding admission on the issue of liability. Because the County will be faced with the prospect of submitting a remedial plan on remand, we note that Harris does not stand for the proposition assigned it by the County. Harris simply held that once a government enters a consent decree, expressly agreeing that the plaintiffs should be granted appropriate relief, it may not thereafter seek to avoid the immediate imposition of such relief by arguing that its current electoral system does not violate Sec. 2 of the Voting Rights Act. Id. at 634