**Honiss W. CANE, Jr., et al.**

v.

**WORCESTER COUNTY, MARYLAND, et al.**

**Civ. No. Y–92–3226.**

United States District Court, D. Maryland.

Jan. 6, 1995.

---

C. Christopher Brown, Baltimore, MD, and Deborah A. Jeon, Cambridge, MD, for plaintiffs.

Edward H. Hammond, Jr., Ocean City, MD, and Benjamin E. Griffith, Cleveland, MS, for defendants.

## OPINION

JOSEPH H. YOUNG, Senior District Judge.

In *Cane v. Worcester County*, 35 F.3d 921 (4th Cir.1994), the Fourth Circuit affirmed the Court's finding that the at-large electoral system used by Worcester County ("County") for election of the County Board of Commissioners ("Board") was violative of § 2 of the Voting Rights Act, 42 U.S.C. § 1973,[1] and reversed and remanded the Court's imposition of a remedial system based upon cumulative voting with instructions to afford the County an opportunity to submit a plan to remedy the § 2 violation. In accordance with the remand, the County proffered three alternative proposals and the plaintiffs submitted one plan, and a hearing was held on the merits.

██ The County, afforded the first opportunity to devise an electoral plan to remedy the § 2 violation, now claims it was not afforded a meaningful opportunity to respond because of the allegedly strict deadlines imposed by the Court. The County, however, did not begin consideration of potential alternatives until after the denial by the Fourth Circuit of the County's petition for a rehearing en banc. This was six weeks after the panel's opinion and almost two years after

the legality of the County's voting scheme was first challenged in court.[2] Moreover, the testimony of County officials suggests that they believe that the plans presented were the best that could be developed and that additional time would not allow for meaningful improvements in the plans.[3] The Court finds the County has been afforded an adequate opportunity to remedy the § 2 violation. Accordingly, the three plans submitted will be considered by the Court.[4]

██ A plan proffered by a legislative body to remedy a § 2 violation must provide the protected minority group with a "realistic opportunity to elect a representative of their choice." *Ketchum v. Byrne*, 740 F.2d 1398, 1413 (7th Cir.1984). At a minimum, a remedial plan must not itself be violative of the Voting Rights Act. *See, Upham v. Seamon*, 456 U.S. 37, 42, 102 S.Ct. 1518, 1521–22, 71 L.Ed.2d 725 (1982). Therefore, a threshold question when evaluating such a plan is whether it violates the standards announced in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).[5]

First, it should be noted that it has been established that the African–American community in Worcester County is politically cohesive and sufficiently large and compact to constitute a majority in a single-member

---

1. *Cane v. Worcester County*, 840 F.Supp. 1081 (D.Md.1994). The Fourth Circuit also affirmed the Court's finding that Bill 93–6, an effort to modify the invalidated electoral system, was structurally identical to that scheme and thus violative of § 2. *Cane v. Worcester County*, 35 F.3d at 929 n. 7.

2. The County also claims that the Court should allow more time before issuing an opinion because the County was not given adequate time to hold public hearings to help devise a remedial plan. No hearings were held, however, to consider the County's position in the original suit or the appeal and no hearings were scheduled following the Court's ruling or the Fourth Circuit's opinion. Further, Board President Jeanne Lynch testified that, "[p]ublic hearing may have a very chilling effect," suggesting that she felt that public hearings on this issue were unlikely to aid the development of a remedial plan.

3. Commissioner Sonny Bloxom testified that, even with more time, "I don't think you're going

to find another way of drawing the districts [other than those proposed] . . . no way."

4. The County has also asked the Court to delay imposition of a new voting system until the United States Supreme Court has considered the County's appeal of the finding of a § 2 violation. The citizens of Worcester County have had their right to vote put on hold long enough and the Court will not tolerate further delay.

5. A voting scheme violates § 2 if: 1) A minority group is sufficiently large and compact to be able to constitute a majority in a single-member district, 2) The minority group is politically cohesive, 3) The majority votes sufficiently as a bloc typically to defeat the minority's preferred candidate, and 4) Based on the totality of the circumstances, there is an inequality in the opportunities of minority voters to elect their preferred candidates. *Thornburg v. Gingles*, 478 U.S. at 47–51, 106 S.Ct. at 2764–67; *Growe v. Emison*, —— U.S. ——, ——, 113 S.Ct. 1075, 1084–85, 122 L.Ed.2d 388, 404 (1993) (applying *Gingles* to single-member district voting schemes).

district.[6] Further, the Fourth Circuit accepted the Court's findings that the white community has typically voted as a bloc to defeat the minority's preferred candidate, and that, considering the totality of the circumstances, African–Americans have not had the same opportunity as whites to participate in the electoral process and to elect representatives of their choice.

The remaining issue, therefore, is whether any of the proposed remedial plans preclude the majority from voting as a bloc to defeat the minority's preferred candidate. The County insists that its three plans are due great deference, but the Court can be deferential only if it finds that one of the plans remedies the § 2 violation.[7] The County's plans cannot be accepted if they continue to allow white candidates to control all of the seats on the Board.

## PROPOSED REMEDIAL PLANS

■ The County's Plan # 2 has been the primary focus of the attention of the parties, and it will be considered first. This scheme divides the County into five single-member districts for both the primary and general elections.[8] The County has attempted to remedy the § 2 violation with the creation of District 3 in which African–American voters comprise 44.68% of the voting age population. The County asserts that in this dis-

trict, "... black voters in Worcester County [would] enjoy a functional majority[9] ... and an equal opportunity to elect the representative of their choice."

The County bases this assertion largely on the work of Dr. Allan Lichtman and Gerald Hebert in "A General Theory of Vote Dilution," 6 La Raza L.J. 1 (1993). The authors do argue that, in principle, "[a] remedial district may include a white population majority if coalition voting is sufficient to elect minority-preferred candidates." *Id.* at 17. It should also be noted that the authors state that the party asserting the adequacy of a remedial district based upon a functional majority should, "have the burden of showing that minority cohesion and turnout, as well as white "crossover" voting are sufficiently high to enable minorities to elect candidates of their choice." *Id.*

The creation of a functional majority district would, in theory, negate the third prong of the *Gingles* test. If a minority community is sufficiently large and a white community is sufficiently fractious, then the majority will be unable to vote as a bloc to enable it usually to defeat the minority's preferred candidate.

The Supreme Court has held that a finding of vote dilution in a multi-member districting plan generally requires remediation by the

---

**6.** The Court found sufficient size and compactness, and thus the existence of a potential remedy for the § 2 violation, based upon the plaintiffs' proposed single-member district plan. *Cane v. Worcester County*, 840 F.Supp. at 1086–87. The Circuit Court affirmed, finding "... meritless the County's assertion that the geographical compactness finding of the district court violates the dictates of *Shaw* [*v. Reno*, —— U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993)]." *Cane v. Worcester County*, 35 F.3d at 927 n. 6.

**7.** The County cites *NAACP v. Kershaw County, S.C.*, 838 F.Supp. 237, 241 (D.S.C.1993):

"Once the legislative body has offered a remedy by which the protected voting group has a voting opportunity that relates favorably to the group's population ... the Court must ... accord great deference to such a legislative choice."

Reliance upon *Kershaw* in this context is misplaced, however, for if the Court finds that the minority group's opportunity is inadequate, no deference to the plan is due.

**8.** Plan # 2 (Percentages of voting age population by district):

Dist. 1: White—69.97% Black—29.21%: Containing Pocomoke City and rural areas in the southern region of the County.

Dist. 2: White—77.39% Black—22.13%: Containing Snow Hill and rural areas in the western region of the County.

Dist. 3: White—54.71% Black—44.68%: Containing Berlin, Newark, and Stockton and rural areas in the center of the County.

Dist. 4: White—96.92% Black—2.22%: Containing rural and resort areas along the west coast of the Chincoteague Bay.

Dist. 5: White—95.75% Black—3.42%: Containing Ocean City and rural and resort areas along the Atlantic Ocean.

**9.** A functional majority district in this context would be one in which blacks, although a minority of voters, could nonetheless typically elect the candidate of choice as a result of white crossover votes.

creation of super-majority districts. *Growe v. Emison,* ——— U.S. at ———, 113 S.Ct. at 1083–84, 122 L.Ed.2d at 403. Remedial districts have been required to contain more than a "... mere majority even of [minority] voting age population ..." unless there is specific evidence on the record to overcome the accepted presumption that a super-majority is necessary for electoral success. *Ketchum v. Byrne,* 740 F.2d at 1413. Further, courts have been reluctant to even consider cross-over voting when adjudicating § 2 remedies. *See, Smith v. Brunswick County, VA Bd. of Supervisors,* 984 F.2d 1393, 1400–01 (4th Cir.1993). Indeed, a remedial plan has never been accepted when its success was dependent entirely upon the effectiveness of functional majorities.

The County nonetheless insists that the 44.68% "functional majority" in District 3 remedies the § 2 violation because the cross-over of white voters will give an equal chance of electoral success to African–Americans. This position is unsupported by the record, however, and the data in fact suggests that District 3 will be dominated by whites. Thus the County has failed to sustain the burden, as described by Lichtman and Hebert and suggested in *Ketchum,* placed on the proponent of a functional majority district. Assuming that all eligible voters do vote,[10] white voters will still control the electoral outcome in District 3 whether predictions of future voting behavior and electoral outcomes are based upon the average cross-over rates or individual elections. The average white cross-over rate in Worcester County is 19%, while the data for African–American cross-over is less certain. The Court found

minority cohesion to be at least 60%, but for the purposes of this analysis it will be assumed to be 80%.[11] Applying those percentages to future elections in the proposed District 3, the candidate preferred by white voters would win with 54% of the vote.[12]

If, alternatively, the Court uses the 1986 District 3 election to predict future voting behavior as urged by the County, the projected rate of African–American cross-over voting would be 38.2% and 32.2% for white cross-over voting.[13] Again, if such numbers are applied to the County's proposed District 3, the white candidate would win with 54% of the vote.[14]

The County has been unable to prove, either from projecting average cross-over voting or voting in specific elections, that the African–American preferred candidate would win, or would have an equal chance to win, an election in District 3. Plan # 2 allows the majority to vote as a bloc to defeat the minority's preferred candidate even if the Court assumes that African–Americans will participate at the same rate in the political process as whites. Furthermore, if actual registration levels are taken into account, the African–American preferred candidate would not win even if white cross-over was at its historic high, 32%, and African–American cohesion was 100%. Plan # 2 is thus unacceptable as a remedial plan.

Plan # 1 uses the same district lines as Plan # 2 as part of a residency district/at-large system which is essentially the same as that considered by the Court in the original proceedings.[15] In such a system, candidates

10. In Worcester County, 77% of white voters register to vote while only 32% percent of eligible African–American voters register. (A large and relatively equal percentage of registered African–American and white voters actually vote). Such patterns are, of course, precisely the reason that a super-majority is typically required in remedial districts, and Dr. Ronald Weber, the County's expert, concedes Lichtman and Hebert's assertion that participation levels are crucial to an evaluation of the effectiveness of a functional majority district.

11. This figure, which Dr. Weber describes as indicating "strong levels" of voter cohesion, is substantially higher than that asserted by the County during the original proceedings.

12. White Candidate: 2,547 votes African–American Candidate: 2207 votes.

13. There is no recorded instance of a larger percentage of white cross-over votes for an African–American candidate running against a white candidate, while African–American cross-over voting for white candidates has been frequently higher.

14. White Candidate: 2,590 votes African–American Candidate: 2,164 votes.

15. Indeed, the County has expressed a strong preference for Plan # 1 as it comes closest to the system imposed by Bill 93–6. The only differ-

would stand for election in the residency district in which they live. County voters, alternatively, would participate in all five primary elections and five one-on-one general elections based on those districts regardless of where they live.

The County asserts that, because of "contest effects," many voters are likely to vote only in the elections involving candidates representing their residency district. Thus, the County argues, the dilutive effect of an at-large electoral system is reduced and a remedy is provided for the § 2 violation by concentrating African–Americans in District 3. While the evidence does not support the claim that dilution is minimized,[16] even if the County's argument is accepted to its extreme, the plan is invalid. If voters of a given residency district only voted in the races involving candidates from that district, Plan # 1 would, in effect, be reduced to Plan # 2 and would be unacceptable for the same reasons. Alternatively, to the extent voters participated in multiple election, this plan unlawfully limits African–American political power through dilution-by-submergence.[17] Plan # 1 is a legally inadequate remedy.[18]

Plan # 3 creates a single-member district system based upon the electoral boundaries established in Bill 93–6. African–Americans would make up the largest percentage of voting age population in District 2 of Plan # 3, but would comprise only 33.6% of the voting age population. The County makes the same functional majority claims for this plan that it does for Plan # 2, and thus the analysis invalidating Plan # 2 invalidates Plan # 3.

## ALTERNATIVE REMEDIES

■ If a municipality fails to proffer an acceptable remedy following a finding of a § 2 violation, a court must exercise its discretion to fashion a "near optimal" plan. *See, Chapman v. Meier,* 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975). When doing so, the court's remedy, "must include consideration of both racial fairness and traditional districting principles." *Bridgeport Coalition for Fair Representation v. City of Bridgeport,* 26 F.3d 271, 278 (2nd Cir.1994). Thus, while the Court need not defer to the County's specific proposals if they are violative of § 2, it must nonetheless effectuate "to the greatest extent possible the policy judgments expressed by the County" which underlie those proposals. *Cane v. Worcester County,* 35 F.3d at 929.

The County has voiced a number of such judgments throughout the course of these proceedings. It stated that its primary desire is to ensure that its electoral system balances the potentially competing considerations of respect for political subdivisions,[19] the maintenance of geographical diversity on the Board,[20] and the preservation of a coun-

ences are the shapes, and therefore the racial composition, of the residency districts.

16. The County enigmatically argues that this plan simultaneously emphasizes "voter empowerment" by allowing citizens a voice in every Board election while urging the Court not to lightly dismiss the assertion that voters will only vote in the campaign involving their residency district.

17. There is no need to reiterate the reasons that this type of voting scheme is unlawful in Worcester County. Regardless of the composition of the residency districts, for the purposes of a *Gingles* analysis Plan # 1, Bill 93–6, and the County's original electoral system are structurally identical.

18. The County argues that Plan # 1, and indeed all three plans, enhance the opportunities of African–Americans to elect the candidate of their choice. Enhancement, while relevant to a § 5 claim, is irrelevant to a § 2 claim. The issue is

not whether a proposed electoral system is superior to the invalidated one, but rather whether the proposed system is an adequate remedy for a Voting Rights Act violation.

19. Bloxom asserted that, "the ideal, of course, [is] to keep the towns intact...." Bill 93–6, which Bloxom said "expresses the legislative findings and the wishes of the government of Worcester County ...," notes that, "Worcester County has a long history and strong tradition of election districts based upon population centers and defined geographic areas of the county ... [which also] serve as a focus for the community, enhance social interaction within the district, promote areas of common interests, and foster friendly competition between districts and communities."

20. "[The municipalities] are independent of each other and often in competition with each other for county services and facilities, government grants and economic development...." Bill 93–

ty-wide community of interests.[21] The County has also asserted a desire to empower the African–American community while avoiding racial polarization and respecting non-racial communities of interest.

It is in the context of these policy judgments that the Court must first consider the single-member district plan offered by the plaintiffs. The plan is superficially similar to the County's Plan # 2, but the remedial district in the plaintiffs' plan contains a 62% African–American voting age majority. The district divides the towns of Snow Hill and Berlin, placing the largely African–American sections of those municipalities in the plan's remedial district, and extending southward to include a predominately African–American section of Pocomoke City.

The County strongly opposes the imposition of the plaintiffs' plan and has repeatedly argued that the division of the towns necessitated by the plaintiffs' plan will undermine the Board's ability to balance the competing interests among the various regions of the county.[22] It is also concerned that the plaintiffs' plan will result in extreme racial polarization and will politically disadvantage African–Americans in the County because, quoting *Shaw v. Reno,* —— U.S. at ——, 113 S.Ct. at 2827, "elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole." Ultimately, the County is concerned that the imposition of a single-member plan, and especially one as allegedly contentious as that proposed by the plaintiffs, will threaten the political community that was created and supported by an at-large electoral system.[23] In short, the County insists that the plaintiffs' plan does little to advance the County's expressed political goals.

Many of these concerns were raised during the original proceedings, and the Court was, and is, reluctant to require a community with such a history of electoral structures and priorities to use the plaintiffs' single-member district plan. It was, in part, because of the political values expressed by the County that the Court originally chose to impose a cumulative voting regime.

The Circuit Court found, quoting Justice Thomas in *Holder v. Hall,* —— U.S. ——, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994), that there is nothing inherently radical or inappropriate about the judicial imposition of cumulative voting pursuant to a finding of a § 2 violation. *Cane v. Worcester County,* 35 F.3d at 927–28. It acknowledged that cumulative voting would "promote the County's desire to have commissioners serve the collective interest of the County by requiring the candidates to appeal to all of the voters in the County." *Id.* at 928. Further, cumulative voting would obviously not require the division of municipalities. *Id.*

In light of the Fourth Circuit's decision, and in strong deference to the County's expressed policy judgments, the Court will not impose the plaintiffs' plan but rather will exercise its discretion to attempt to fashion a "near optimal" plan for the County. The County's primary elections for Board of Commissioners will be by single-member district based upon the district maps designed

---

6. The County has expressed the fear that, if towns are divided or geographic diversity on the Board not maintained, the Board will be unable to adequately and fairly reconcile the competing municipal interests in the County.

21. The County has repeatedly emphasized its preference for some form of at-large elections so that all of the commissioners will be responsible to all of the voters. As noted in Bill 93–6, "Requiring each commissioner candidate to stand for election and to campaign throughout the county helps each candidate appreciate and understand the different parts of the county and encourages commissioners so elected to make decisions based upon the best interests of the entire county rather than to pursue actions which may be beneficial to only one geographical area but which would be detrimental to the rest of the county ... at-large elections serve to promote cooperation among the regional areas on important county-wide issues and help to minimize divisive north-county/south-county polarization."

22. For example, Bloxom suggested that division of the towns would, because "often their [the towns'] interests are divergent," make it very difficult for the Board to "spend the county tax dollars in the way that satisfies all the citizens of the county."

23. Lynch asserted that a "district system polarizes, I believe, terribly."

by the County for Plans # 1 and # 2. The general election will be by cumulative voting as described in *Cane v. Worcester County*, 847 F.Supp. 369, 372–74 (D.Md.1994). The use of cumulative voting in the general elections will provide the benefits previously described by the Court, while a single-member district primary will ensure substantial geographic diversity on the Board.

The Court's plan will provide a substantial remedy for African–American citizens of Worcester County. The record suggests that African–Americans in the County are primarily Democrats, while whites are split relatively evenly between the parties. This being so, African–Americans will comprise a significant majority of Democrats in District 3 and should be able to elect their preferred candidate in the primaries.[24] A cumulative voting regime for the general election would then allow African–Americans voters countywide to elect the nominated Democrat from District 3 if they so chose. *See, Cane v. Worcester County*, 847 F.Supp. at 372.[25]

The Court's plan would also address the County's concerns with geographic diversity. The use of single-member district guarantees that all regional interests, as defined by the County's districting scheme, will have candidates standing in the general election. After a general election based upon cumulative voting, at least three of the five districts will be represented on any given Board. Moreover, if a particular region or municipality desires representation, it is assured of two candidates in the general election and it will be able to successfully elect a Commissioner as long as at least 17% of the County electorate is so committed.[26]

The plan imposed by the Court best achieves the Fourth Circuit's mandate and adheres to the requirements of the Voting Rights Act and the political will of Worcester County. African–American voters of the County will have an opportunity to elect a candidate of their choice, but that opportunity will not come at the expense of geographical diversity, the division of municipalities, or racial segregation. Coalitions of voters will be free to cast their ballots on the basis of race, region, political issue, or any other consideration and have a real chance of electoral success while Board members will still be beholden to every County citizen.

The County has urged the Court to give sufficient time to allow officials to implement the new electoral system, to allow candidates to campaign, and to ensure that citizens are informed of the new electoral system and the candidates they are to select from. In deference to this request and the dictates of Maryland law, the election for Board of Commissioners will be held no later than November 7, 1995.

The Court will retain jurisdiction to ensure that the terms of the Order are complied with and to provide assistance to the parties if necessary.

SO ORDERED.

---

**24.** A conservative estimate based upon the record is that 80% of African–American voters are Democrats, 10% are Republicans, and 10% are independents while 50% of white voters are Democrats, 40% are Republicans, and 10% are independent. (The record also indicates that, while those percentages are relatively constant for African–Americans, whites are increasingly voting Republican.) Based on these number, African–American Democrats would have a 14% majority in the Democratic primary in District 3.

**25.** The plaintiffs have stated that they fear that the Court's plan may be too complicated. In fact, the plan is similar to Bill 93–6 and the County's invalidated electoral system in that it combines elements of both a single-member and at-large electoral system. Like the County's prior at-large system, the Court's plan requires citizens of the County to recognize district boundaries while allowing the voters to have a voice in all Board races.

**26.** *See, Cane v. Worcester County*, 847 F.Supp. at 372.