**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

THURMAN GAUSE; JOHN R. FRINK;
WILLIE SLOAN; HENRY J. BRYANT;
EDWARD THOMAS; ROSCOE BUTLER;
WILLIE FULLWOOD,
Plaintiffs-Appellants,

v.

BRUNSWICK COUNTY, NORTH
CAROLINA; BRUNSWICK COUNTY
BOARD OF COUNTY COMMISSIONERS;

                                       No. 95-3028

DONALD WARREN; JERRY JONES;
WAYLAND VEREEN; TOM RAYBON;
DONALD SHAW, Members of the
Brunswick County Board of County
Commissioners; BRUNSWICK COUNTY
BOARD OF ELECTIONS; ORRIE GORE;
MARION D. DAVIS; BILLY BENTON,
Members of the Brunswick County
Board of Elections,
Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Wilmington.
Franklin T. Dupree, Jr., Senior District Judge.
(CA-93-80-7-D)

Argued: July 9, 1996

Decided: August 13, 1996

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Anita Sue Hodgkiss, FERGUSON, STEIN, WALLAS, ADKINS, GRESHAM & SUMTER, P.A., Charlotte, North Carolina, for Appellant. Michael Crowell, THARRINGTON SMITH, Raleigh, North Carolina, for Appellees. **ON BRIEF:** James J. Wall, LEGAL SERVICES OF THE LOWER CAPE FEAR, INC., Wilmington, North Carolina, for Appellant. E. Hardy Lewis, THARRINGTON SMITH, Raleigh, North Carolina; Michael R. Ramos, Brunswick County Attorney, RAMOS & LEWIS, Shallotte, North Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

The plaintiffs, seven African-American voters and politicians, sued Brunswick County (North Carolina) and County officials, alleging that the method by which members of the County's Board of Commissioners are elected dilutes minority votes in violation of § 2 of the Voting Rights Act, 42 U.S.C. § 1973. The district court granted summary judgment to the defendants. We affirm because the lack of electoral success, if any, by the candidates of African-Americans' choice is due to the small number of African-American voters and their geographical dispersion throughout the County.

I.

Brunswick County's African-American population today is relatively small. According to the 1990 Census, 50,985 people live in

2

Brunswick County, 38,960 of whom are of voting age. The population has increased dramatically since 1960, when 20,278 people lived there. Much of the population growth is due to an influx of white retirees from colder climates. As a result of this demographic shift, the total percentage of African-Americans living in the County fell from 35 percent in 1960 to 18 percent in 1990. In 1990 the County's voting-age population was 83 percent white, 16 percent African-American, and 1 percent other ethnic groups. Fourteen percent of registered voters are African-American. Of the County's 22 election precincts, African-Americans constitute a majority in only one. In seven precincts, more than 90 percent of the registered voters are white. African-Americans constitute a majority in less than 6 percent of the County's Census blocks. They constitute a majority in none of the County's six townships.

The County uses a modified at-large election system to choose its Board of Commissioners. The Board has five members, and elections for two-year terms are held every other year, with all seats up for grabs. The County is divided into five residency districts, and the candidate from each district who receives the most votes, compared only to other candidates living in the same district, serves. Voters, however, may vote for any candidate, regardless of where they or the candidate live. No African-American has been elected to the Board of Commissioners since 1982. African-Americans have run for Board of Commissioners in 9 elections since 1972, and have been elected 3 times.[1] The parties do not dispute the above facts, but do dispute their meaning.

The plaintiffs claim that African-Americans have been unable to elect their preferred candidates to the Board and that the County's election structure is responsible. The plaintiffs propose that a majority African-American voting district be created to ensure that African-Americans are adequately represented on the Board of Commissioners. We believe that because African-Americans in Brunswick County are too few and too dispersed, the plaintiffs have failed to establish a prima facie case of vote dilution.

_____

[1] African-Americans sought to be elected to the Board in 1972, 1974, 1976, 1978, 1980, 1982, 1984, 1990, and 1994. African-Americans were elected in 1974, 1976, and 1982.

II.

Section 2(b) of the Voting Rights Act, 42 U.S.C.§ 1973(b), provides that an election system improperly dilutes the vote of minorities if

> based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by [minorities] in that [they] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which [minorities] have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have [minorities] elected in numbers equal to their proportion in the population.

A vote dilution challenge to a multimember election system may not proceed unless the plaintiff first establishes the following preconditions ("Gingles preconditions"): (1) that the minority population "is sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) that the minority group "is politically cohesive"; and (3) "that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." Thornburg v. Gingles, 478 U.S. 30, 50-51 (1986); see also Shaw v. Hunt, 64 U.S.L.W. 4437, 4442 (U.S. June 13, 1996); Johnson v. DeGrandy, 114 S. Ct. 2647, 2654-55 (1994); Growe v. Emison, 113 S. Ct. 1075, 1084 (1993). Failure of proof on even one precondition defeats a vote dilution claim. Gingles, 478 U.S. at 50-51 n.17; McGhee v. Granville County, 860 F.2d 110, 116-17 (4th Cir. 1988); McNeill v. Springfield Park Dist., 851 F.2d 937, 942 (7th Cir. 1988), cert. denied, 490 U.S. 1031 (1989).

We believe the district court correctly concluded that the plaintiffs failed to establish the first Gingles precondition: geographic compactness.**2**

_____

**2** The district court also found that the plaintiffs failed to satisfy the third Gingles precondition: that majority bloc voting usually defeats the minority's preferred candidate. Because we find that the plaintiffs have failed to establish compactness, we need not consider whether they have forecast sufficient evidence of majority bloc voting.

4

> The reason that a minority group making a [vote dilution] challenge must show, as a threshold matter, that it is sufficiently large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice.

Gingles, 478 U.S. at 50-51 n.17 (emphasis in original). In other words, minority voters must show that their votes have been diluted by discriminatory elements of the election process, and not simply that their votes are dilute. See DeGrandy, 114 S. Ct. at 2659-60; McNeil, 851 F.2d at 946. "[T]he adverse `result' for which [Section 2] seeks a remedy must be traceable ultimately to the impact of `a certain electoral law, practice, or structure interact[ing] with social and historical conditions.'" McGhee, 860 F.2d at 117 (quoting Gingles, 478 U.S. at 47) (emphasis supplied).

The evidence here shows that the African-American population is dispersed throughout the County, constituting a majority in no single township and a majority in only one election precinct, the County's smallest. The plaintiffs' vote dilution claim fails because the African-American population "is spread evenly throughout" the County. Gingles, 478 U.S. at 51 n.17; accord Bush v. Vera, 64 U.S.L.W. 4452, 4460 (U.S. June 13, 1996) (plurality opinion of O'Connor, J., joined by Rehnquist, C.J., and Kennedy, J.); Smith v. Brunswick County, Virginia, 984 F.2d 1393, 1399 (4th Cir. 1992).

The plaintiffs make two attempts to prove that a reasonably compact majority African-American voting district may be constructed. Both attempts fail. The first proposed district sweeps through five of the County's six townships and is 75 miles from tip to toe. We believe the defendants' description of the proposed district is accurate:

> [The plaintiffs propose] a 75 mile-long boomerang-shaped district that meanders, seemingly aimlessly, around the [southern] and eastern legs of the triangle.[Brunswick County is roughly triangular.] From the vertex in Southport [in the southeast] extend two "arms" which themselves are irregular, especially the southern appendage extending from

5

> Southport westward to Calabash. The path of this arm roughly follows highways 211 and 17, but it juts randomly northward and southward from the highway to capture pockets of minority population. At one point a boot-like tentacle steps southward toward Holden Beach. At several other points, the district is only one census block wide. Befitting its tortured path, the lower arm ends near Calabash with a flourish -- hooking westward and then eastward, almost falling back on itself. Ironically, as positioned on the page in the joint appendix [JA 68A], this narrow, winding district looks like a 75 mile-long question mark.

Br. of Appellee, at 14 (footnote omitted). Because the first proposed district is "unreasonably irregular, bizarre,[and] uncouth," it does not establish that the African-American population of Brunswick County is sufficiently large and geographically compact to support a claim for relief under § 2 of the Voting Rights Act. Cane v. Worcester County, 35 F.3d 921, 925 (4th Cir. 1994) (quoting Cane v. Worcester County, 840 F. Supp. 1081, 1087 (D. Md. 1994)), cert. denied, 115 S. Ct. 1097 (1995); accord Jeffers v. Tucker, 847 F. Supp. 655, 661-62 (E.D. Ark. 1994). Furthermore, the plaintiffs have not shown that in developing their proposal they "adhered to [ ] traditional districting principles." Cane, 35 F.3d at 927 n.6.

The second proposed majority African-American district is significantly more compact, having omitted the first proposed district's eastern arm and having smoothed out some of the irregularity at the western end of the southern arm. The second proposal, however, has an even more serious flaw: it violates the one-person/one-vote rule compelled by the Equal Protection Clause of the Fourteenth Amendment.

To comply with the Equal Protection Clause, each voting district should contain the same approximate number of voters. Voinovich v. Quilter, 113 S. Ct. 1149, 1159 (1993); Brown v. Thomson, 462 U.S. 835, 842 (1983); Connor v. Finch, 431 U.S. 407, 416 (1977); Reynolds v. Sims, 377 U.S. 533, 568 (1964). Equality of district size is necessary to ensure "that each person's vote may be given equal weight." Connor, 431 U.S. at 416.

6

Brunswick County has a total population of 50,985. Thus, if all five districts were of equal size, each would contain 10,197 people. The second proposed majority African-American district would contain 9,080 people, or 11 percent below the ideal size of 10,197. Under this proposal, the white district with the largest total population would contain 10,527 people, or 3 percent above ideal. Thus, in terms of total population, the plaintiffs' second proposal would result in a size deviation of 14 percent between the largest and smallest districts.

When voting-age population is compared, the deviation is more dramatic. The County's total voting-age population is 38,960, so ideally each district would contain 7,792 persons of voting age. Under the plaintiffs' second proposal, though, the majority African-American district would contain 6,464 persons of voting age, or 17 percent fewer than the ideal district would contain. The white district with the largest voting-age population would contain 8,537 persons of voting age, or 10 percent greater than ideal. The total deviation in terms of voting-age population, then, would be 27 percent under the plaintiffs' proposal.

A total deviation of greater than 10 percent presumptively violates the Equal Protection Clause. Brown, 462 U.S. at 842-43. Nevertheless, such a deviation may be upheld if "supported by substantial and legitimate state concerns," such as allowing district lines to track natural geographic barriers, significant topological features, or long-standing political boundaries. Id. The plaintiffs' second proposal cannot be justified on the basis of these traditional concerns. Like the first proposed district, albeit to a lesser extent, the second proposed district respects neither township nor precinct lines, nor are its boundaries mandated by geography.

The plaintiffs have come forward with only one rationale in support of such a large population deviation: to allow creation of a majority African-American voting district. The Supreme Court has recently instructed us, however, that race-conscious districting may be allowed only if doing so would be a narrowly tailored method of furthering a compelling state interest. Shaw, 64 U.S.L.W. at 4440; Bush, 64 U.S.L.W. at 4458-59 (plurality opinion) & 4466-67 (Thomas, J., concurring, joined by Scalia, J.).

7

The plaintiffs' asserted rationale does not justify drawing districts whose populations deviate so dramatically. The plaintiffs claim that the extreme deviation must be allowed in order to redress the dilution of minority votes. This argument, however, is fatally circular because no dilution has yet been proven, nor can dilution be proven absent an independent showing of geographical compactness. The plaintiff cannot show a compelling interest in redressing vote dilution without <u>first</u> proving compactness. Compactness is an essential element of a vote dilution claim, and that element must be satisfied by showing that a minority representation district can be drawn in a manner that complies "with the overriding demands of the Equal Protection Clause." <u>Sanchez v. Colorado</u>, 861 F. Supp. 1516, 1523 (D. Colo. 1994).

> [A] plaintiff seeking to meet its burden of showing compactness under the first <u>Gingles</u> precondition should not be permitted to rely on a plan which, if subsequently adopted by the Court after a finding of a Section 2 violation, would have no chance of being found to be narrowly tailored to redress the violation.

<u>Reed v. Town of Babylon</u>, 914 F. Supp. 843, 871 (E.D.N.Y. 1996). If we were to accept the plaintiffs' argument, every § 2 plaintiff could bootstrap his way out of <u>Gingles</u>' compactness requirement by claiming that some unconstitutionally small district is "compact." This we cannot allow. <u>See McNeil</u>, 851 F.2d at 946. **3**

_____

**3** At oral argument the plaintiffs suggested (for the first time) that even if the African-American population is insufficiently compact to support creation of a majority African-American district, the population is sufficiently compact to allow creation of an African-American influenced district, in other words, a district with a significant (although minority) African-American presence. Because the plaintiffs did not raise this argument below, we decline to consider it. <u>See Growe</u>, 113 S. Ct. at 1084 n.5; <u>Bakker v. Grutman</u>, 942 F.2d 236, 242 (4th Cir. 1991). Nor do we accept the plaintiffs' suggestion that we remand the case to the district court for reconsideration in light of the Supreme Court's recent decisions in <u>Shaw</u> and <u>Bush</u>. We believe the district court's approach to the question of compactness presented here was consistent with the two recent Supreme Court cases.

8

The judgment is affirmed.

<u>AFFIRMED</u>

9